885 F.Supp. 1265 (1995)
Andrew SIX, Petitioner,
v.
Paul DELO, Respondent.
No. 4:91CV02108 GFG.
United States District Court, E.D. Missouri, Eastern Division.
May 2, 1995.
*1266 *1267 *1268 *1269 Philip M. Horwitz, Haller and Leonard, St. Louis, MO, Leo N. Griffard, Jr., Boise, ID, for Andrew W. Six.
Stephen Hawke, Asst. Atty. Gen., Jefferson City, MO, for Paul K. Delo.

MEMORANDUM
GUNN, District Judge.
This matter is before the Court on the petition for writ of habeas corpus of Andrew Six.
Petitioner was convicted of first degree murder and was sentenced to death. At the time of the killing, the victim, Kathy Allen, was twelve years old and living with her parents and her pregnant sister Christine, age seventeen, in Ottumwa, Iowa. On April 7, 1987, petitioner and Donald Eugene Petary visited the Allen's trailer-home to look at a pickup truck the family was trying to sell. On April 10, 1987, after purchasing duct tape and plastic gloves, the two men returned to the trailer in a station wagon late at night. They convinced Mrs. Allen to come with them on a test drive of the pickup.
During the drive, petitioner and Petary overpowered Mrs. Allen and taped her hands behind her back. Upon returning to the trailer, the two men, brandishing knives, taped Mr. Allen's hands and forced the couple and Kathy into a bedroom. While Petary guarded them, petitioner raped Christine in another room.
Following the rape, petitioner ordered Christine and Kathy to get dressed and had Petary take the two girls to the station wagon. Petitioner took the parents' wallets and tried to force the couple outside. Mr. Allen broke free and ran for help. Petitioner then slit Mrs. Allen's throat; Mrs. Allen survived. Meanwhile Christine had also broken free. Petitioner and Petary drove away with Kathy.
Kathy was later discovered in a ditch in Missouri. Her throat was deeply cut. She bled to death.
A jury found petitioner guilty of murder in the first degree. However, during the penalty phase of the trial, the jury was unable to agree on punishment. The trial judge imposed a sentence of death. Petitioner timely appealed his sentence and conviction and also the denial of post-conviction relief which he sought pursuant to Missouri Supreme Court rule 29.15. The Missouri Supreme Court consolidated petitioner's appeals and affirmed his conviction, sentence and the denial of post-conviction relief. State v. Six, 805 S.W.2d 159 (Mo.1991). The United States Supreme Court denied the petition for writ of certiorari. Six v. Missouri, 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Petitioner *1270 subsequently filed a motion to recall the mandate and a Rule 91 state habeas corpus petition, both of which were summarily denied by the Supreme Court of Missouri. Andrew Six filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 17, 1991. This Court appointed counsel, and the first amended petition presents numerous grounds for relief.

GROUND I. RIGHT TO AN UNBIASED TRIAL JUDGE
Petitioner argues that his sentence was made by a biased trial judge who favored the death penalty and was therefore not impartial in violation of the Eighth and Fourteenth Amendments. Petitioner explains that he and his co-defendant Petary were both charged with kidnapping Kathy Allen in the United States District Court for the Southern District of Iowa and with her murder in Schuyler County, Missouri. In September, 1987, both men were convicted of kidnapping and petitioner was sentenced to two hundred (200) years imprisonment without eligibility for parole for sixty-six (66) years.
Petitioner alleges that Schuyler County, Missouri, was experiencing a severe economic decline during 1987 and 1988 and that County Commissioners were concerned about the cost of trying Petary and petitioner. After considerable debate on the issue, the commission finally voted in favor of having the trial. According to petitioner, the Commissioners felt that the deaths of Petary and petitioner were worth pursuing despite the financial hardship. Petitioner alleges that the trial judge knew about this allocation of scarce resources and prior to the vote, even attended one of the commission's meetings at which the Commissioners asked for the trial judge's advice on ways to finance the operation of the court. Petitioner argues that the trial judge was biased in favor of the death penalty because he was under pressure to sentence Petary and petitioner to death to make Schuyler County's investment in the trials worthwhile and because he knew that he had to run for re-election every six (6) years.
Respondent argues that this ground is procedurally defaulted. Basically, before a petitioner can bring a federal habeas action, he must have presented the same legal theories and factual bases to the state courts. Battle v. Delo, 19 F.3d 1547, 1552 (8th Cir. 1994) (citing Anderson v. Harless, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982)). Claims not presented to the state court are procedurally barred unless petitioner can show cause for, and prejudice resulting from, the default. Smith v. Jones, 923 F.2d 588, 589 (8th Cir.1991). In addition, petitioner can raise a claim of actual innocence to prevent a procedural default, in which case, petitioner must offer new evidence that was not presented at trial because it was not available or was excluded and must "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Schlup v. Delo, ___ U.S. ___, ___, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995).
Upon reviewing the record in this case, the Court concludes that petitioner first raised his claim that he was denied his right to an unbiased trial judge in his state habeas corpus petition. The Missouri Supreme Court denied that petition because it disclosed only procedurally barred claims not raised on direct appeal or in petitioner's Rule 29.15 motion. (Pet'r Exh. 1C.) As such, this claim is procedurally barred.
However, petitioner argues that the cause for and prejudice resulting from the default can be shown. Petitioner offers two arguments to show cause in this case: (1) ineffective assistance of post-conviction counsel and (2) the trial judge's failure to disclose to trial counsel information which would have alerted counsel to the judge's bias. Initially, the Court notes that the Eighth Circuit has held that ineffective assistance of post-conviction counsel cannot be "cause" for purposes of lifting a procedural bar. LaRette v. Delo, 44 F.3d 681, 688 (8th Cir.1995) (citing Foster v. Delo, 39 F.3d 873, 877 (8th Cir.1994) (en banc), cert. denied, ___ U.S. ___, 115 S.Ct. 1719, 131 L.Ed.2d 578 (1995)). Furthermore, petitioner's allegation that the trial judge's failure to disclose certain information to trial counsel does not constitute "cause" in this case.
*1271 The trial judge, the Honorable E. Richard Webber, testified at the Rule 29.15 evidentiary hearing as petitioner's first witness. Petitioner's post-conviction counsel questioned Judge Webber thoroughly about his involvement with Schuyler County's Commission and his knowledge of the County's financial difficulties. (Resp't Exh. D at 280-84). Judge Webber testified that he was on the State Court Budget Committee and that he worked with the commission for Schuyler County on the budgeting process. Id. at 281. He stated that he was not involved in any way in the decision to try Petary and petitioner, nor was he involved in discussions on the costs or financing of the trials. Id. at 282. He admitted that he had heard rumors of the costs and that he had told some court personnel that he thought the estimated cost was too high. Id. at 283.
Post-conviction counsel's questioning of Judge Webber reveals that counsel must have had some knowledge of Schuyler County's financial woes and of Judge Webber's work on the budgetary process before the Rule 29.15 hearing. As such, any claim of bias could have been brought as part of petitioner's Rule 29.15 motion, and the trial court's alleged failure to give trial counsel certain information cannot constitute "cause" sufficient to overcome the procedural bar in this case.
Furthermore, even if petitioner could demonstrate "cause" in this case, petitioner could not show prejudice because his claim of bias lacks merit. It is true that a fair trial before a fair tribunal is a basic requirement of due process. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The right to a fair trial necessarily requires that the trial judge be neutral, detached and free from actual bias. Dyas v. Lockhart, 705 F.2d 993, 995 (8th Cir.), cert. denied, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983). "Generally, a habeas petitioner seeking reversal of his conviction on due process grounds because of the trial judge's alleged bias must demonstrate that the judge was actually biased or prejudiced against the petitioner." Id. at 996 (citations omitted). Disqualification of a judge for actual bias or prejudice is a serious matter and should only be required when the evidence is compelling. Fero v. Kerby, 39 F.3d 1462, 1478 (10th Cir.1994), petition for cert. filed, (U.S. Jan. 26, 1995) (No. 94-7904).
In addition, there are cases where "`experience teaches that the probability of actual prejudice on the part of the judge or decision-maker is too high to be constitutionally tolerable.'" Dyas, 705 F.2d at 996 (quoting Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)). Examples of such lessons include where the judge has a pecuniary interest in the outcome of a trial or where the judge has been the target of personal abuse or criticism from the party before him. Id. "The test in determining if a judge's bias should be presumed in a particular case is whether, realistically considering psychological tendencies and human weaknesses, the judge would be unable to hold the proper balance between the state and the accused." Id. (citations omitted). The honesty and integrity of those serving as judges is presumed. Id.
In this case, petitioner has not shown either actual bias or the appearance of bias sufficient to suggest that Judge Webber would have been unable to hold the proper balance between the state and the accused. Nothing in Judge Webber's testimony at the Rule 29.15 evidentiary hearing indicates that the judge harbored any bias towards petitioner. His testimony regarding his work with the county commission does not reveal any bias directed at petitioner; he stated that he never discussed petitioner's case with the commission and that the county's financial problems in no way affected the sentence he imposed. (Resp't Exh. D at 281, 291.) News articles, including a series written by Judge Webber on the operation of the Schuyler County Courthouse, submitted by petitioner, also do not contain any statements from which this Court or any reasonable person could infer bias against petitioner. Furthermore, Judge Webber testified that no political concerns, such as concerns regarding his own re-election, affected the sentence he chose for petitioner. Id. at 291. Petitioner had an opportunity to produce evidence at a fair hearing before the Rule 29.15 court; however, there is simply no evidence in the *1272 record suggesting that Judge Webber was unable to hold the proper balance between the state and the accused. Accordingly, the Court finds that petitioner's first ground is procedurally barred.

GROUND II. TRIAL JUDGE RELIED UPON IMPRESSIBLE FACTORS OUTSIDE THE RECORD AT SENTENCE
For his second ground, petitioner alleges that the trial judge impermissibly relied upon the Bible when deciding whether to impose the death sentence without affording petitioner an opportunity to respond to the scriptural authorities. Prior to announcing his decision of death for petitioner, the trial judge referenced certain passages from the Bible. Petitioner claims that the trial judge impermissibly factored his own sense of religion into the sentencing decision. Petitioner asserts that the judge's factoring of his own sense of religion does not comply with the constitutional requirement that the sentencing judge's discretion be channelled by clear and objective standards that provide specific and detailed guidance.
Petitioner first raised this issue in his motion to recall the mandate as part of an ineffective assistance of appellate counsel. (Resp't Exh. I at 22.) Claims for ineffective appellate counsel are properly raised for the first time in a motion to recall the mandate. Hall v. Delo, 41 F.3d 1248, 1250 (8th Cir. 1994). However, all other claims in a motion to recall the mandate that could have been raised on direct appeal or in a Rule 29.15 motion are defaulted under Missouri law. Feltrop v. Delo, 46 F.3d 766, 775 (8th Cir. 1995). Therefore, petitioner's claim recast as an ineffective assistance of counsel for failing to raise the issue is not defaulted.
A convicted defendant claiming that counsel's assistance was so defective as to require reversal of a conviction must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. at 2064. However, counsel cannot be considered ineffective for failing to raise a meritless claim. Grubbs v. Delo, 948 F.2d 1459, 1464 (8th Cir.1991), cert. denied ___ U.S. ___, 113 S.Ct. 109, 121 L.Ed.2d 67 (1992). In this case, the Court finds that petitioner's claim that Judge Webber impermissibly relied on biblical passages during the sentencing phases is meritless and that appellate counsel was therefore not ineffective for failing to raise it.
In his closing remarks during the penalty phase of trial, defense counsel drew the jurors' attention to God and argued that vengeance belongs to the Lord and should not be dealt by the state through a death sentence. (Resp't Exh. A at 1289, 1292-93.) The prosecutor also mentioned God and argued that only the merciful should receive mercy. Id. at 1302-1303. Judge Webber responded to the attorneys' references on the record before he announced his sentence in petitioner's case:
I listened carefully to the recitation of respective counsel as they each correctly referred to the passage in Matthew Five, Verse Seven. "Blessed are the merciful, for they will be shown mercy." Quite by chance I came upon a verse while waiting for the jury to return its verdict this afternoon. It is James Two, Verse Twelve. "Speak and act as those who are going to be judged by the law and that gives freedom, because judgment without mercy will be shown to anyone who has not been merciful. Mercy triumphs over judgment." However, my perception of my job is not to reward [or] to to [sic] punish, except as the evidence dictates.
(Resp't Exh. A at 1311.) Petitioner argues that Judge Webber relied on the Bible in his deliberations. However, the record reflects that he found the quoted passage while the jury was deliberating, before the jury hung and before the judge was faced with making the sentencing decision. In addition, while Judge Webber noted his interest in the attorneys' discussion of the Bible, he responded to it by stating that his decisionmaking process is dictated only by the evidence. There is no evidence from the trial transcript that the *1273 judge relied upon the Bible as petitioner argues.
At the Rule 29.15 evidentiary hearing, Judge Webber did testify that he looked at the Bible and prayed when he went back to his chambers to deliberate his sentence; however, he also indicated that those actions took place before he actually began considering petitioner's sentence. (Resp't Exh. D at 284, 291-92.) In addition, when asked what particular factors and information he relied upon, Judge Webber indicated only facts and information based on the evidence at trial. Id. at 287. He also explicitly testified that he focused upon the notes that he took during trial and that he weighed the testimony of all the witnesses. Id. at 292. In light of Judge Webber's statements during the trial and his testimony at the Rule 29.15 hearing, petitioner's claim that the trial judge relied impermissibly on the Bible is meritless.
Petitioner also claims that the judge impermissibly considered statements by Petary inculpatory of petitioner. The statements were made in front of Judge Webber during pretrial matters before the severance of petitioner and Petary's cases. Contrary to respondent's contention, petitioner raised this issue in his brief on direct appeal, and it is therefore not procedurally barred. (Resp't Exh. E at 65.)
Petitioner's claim that the trial judge relied on hearsay in deciding petitioner's sentence lacks merit. Nothing in the trial transcript suggests that Judge Webber considered any statements made by Petary in sentencing petitioner. At the 29.15 hearing, Judge Webber testified, as discussed above, that he relied on the evidence presented at trial when he made his decision. Id. at 287, 292. Furthermore, the judge was asked about the specific statements made by Petary inculpating petitioner for Kathy Allen's murder and the judge stated that he did not consider the matters as part of the evidence before him. Id. at 292-93. Judge Webber admitted that he could not forget the statements made against petitioner; however, he explained that he focused on his own notes regarding the witnesses' testimony and the evidence presented at petitioner's trial. Id. at 288, 293. Accordingly, the Court finds that petitioner's claim that the trial judge impermissibly relied on hearsay statements lacks merit.

GROUND III. UNCONSTITUTIONAL JURY INSTRUCTION
Prior to the jury's deliberation in the penalty phase of petitioner's trial, the jury was read Missouri Approved Jury Instruction ("MAI") 313.48, which states, in relevant part:
If after due deliberation you are unable to agree upon the punishment your foreman will sign the verdict form so indicating. In such case the Court will fix the defendant's punishment at death or at imprisonment for life by the Division of Corrections without eligibility for probation or parole. You will bear in mind, however, that under the law it's the primary duty and responsibility of the jury to fix the punishment.
(Resp't Exh. A at 1275.) Petitioner argues that this instruction, because it was read prior to deliberations, diminished the jury's sense of responsibility and violated petitioner's Eighth Amendment rights.
On direct appeal, the Missouri Supreme Court relied on California v. Ramos and concluded that giving the above instruction was not unconstitutional: "As an `accurate statement of a potential sentencing alternative' this instruction and verdict form do not violate any of the substantive limitations placed on the capital sentencing process by the Eighth and Fourteenth Amendments." Six, 805 S.W.2d at 167 (quoting California v. Ramos, 463 U.S. 992, 1009, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171 (1983)). In Ramos, the jury was instructed that they could sentence the defendant to death or to life imprisonment; however, the judge explained that the state governor has the power to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime. Ramos, 463 U.S. at 995-96, 103 S.Ct. at 3450. The Supreme Court rejected the defendant's argument that such an instruction deflects the jury's attention away from its central task. Id. at 1005-1006, 103 S.Ct. at 3455-3456. The Court held that informing the jury of the governor's power to commute a *1274 life sentence was "merely an accurate statement of a potential sentencing alternative." Id. at 1009, 103 S.Ct. at 3457.
Petitioner relies on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In that case, the Supreme Court held that comments by the prosecutor violated the Eighth Amendment and vacated a death sentence. The prosecutor minimized the jury's sense of the importance of its role during closing argument at the penalty phase of trial. Id. at 325, 105 S.Ct. at 2637-38. The prosecutor told the jury that a death sentence would be automatically reviewed by the Mississippi Supreme Court and argued to the jury that its decision would not be final. Id. at 325-26, 105 S.Ct. at 2637-38.
The Supreme Court found that the prosecutor's remarks were unconstitutional because they were misleading and inaccurate. Id. at 330-31, 105 S.Ct. at 2640-41. While the state supreme court would automatically review death sentences, the standard of review which presumes the correctness of the sentence was not explained to jurors; in other words, the thrust of the prosecutor's comments suggested that the jury could pass its decision off to the state supreme court by sentencing the defendant to death. Id. This in turn created bias and prejudice in favor of imposing the death penalty, another reason the Supreme Court found the prosecutor's remarks to be unconstitutional. Id. at 331-33, 105 S.Ct. at 2640-42.
In this case the instruction at issue was not misleading or inaccurate. It did not generate a bias in favor of returning a death sentence. The instruction specifically cautions that: "You will bear in mind, however, that under the law, it's the primary duty and responsibility of the jury to fix the punishment." (Resp't Exh. A at 1275.) Therefore, Ramos and not Caldwell is instructive and the instruction given in this case was not unconstitutional.
The Court notes that petitioner also includes an equal protection claim. He points out that no other class of Missouri defendants is subject to the instruction at issue. The Missouri Supreme Court rejected his argument because "MAI-CR 3d 312.02, submitted in other criminal cases, provides that the jury may be instructed that the court will fix punishment, if after due deliberation, the jury is unable to agree on punishment." Six, 805 S.W.2d at 167. Due to the substantive inaccuracy of petitioner's claim, this Court agrees that it must fail.

GROUND IV. NO INSTRUCTION ON SECOND DEGREE FELONY MURDER AS A LESSER INCLUDED OFFENSE
Petitioner claims that his conviction and sentence are unconstitutional because the trial court refused to instruct the jury on second degree felony murder, contrary to the holding of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The Court disagrees. Petitioner raised this issue on direct appeal.
The Court in Beck addressed the narrow issue of whether a sentence of death can constitutionally be imposed after a jury finds a defendant guilty of a capital offense "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Id. at 627, 100 S.Ct. at 2384. In that case, the jury was instructed only as to the capital offense of "`[r]obbery or attempted robbery when the victim is intentionally killed by defendant.'" Id. at 627, 100 S.Ct. at 2384 (quoting Ala. Code § 13-11-2(a)(2)). The death penalty statute at issue gave the jury the choice of either convicting the defendant of the capital crime, requiring the imposition of the death penalty, or acquitting him. Id. at 628-29, 100 S.Ct. at 2384-85.
The defendant wanted a felony murder instruction and argued that the jury should have been given the option of convicting him of a lesser included offense. Id. at 628, 100 S.Ct. at 2384-85. The Court agreed with defendant and held that the lesser included offense instruction should have been given. The Court explained that if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, then the state is constitutionally prohibited from withdrawing that option from the jury *1275 in a capital case. Id. at 638, 100 S.Ct. at 2390.
Beck is distinguishable because the jury in the case at hand was instructed on a lesser included offense: conventional second-degree murder. (Resp't Exh. A at 1121.) This is not a case like Beck where the jury was faced with an all-or-nothing decision. The Supreme Court's decision in Schad v. Arizona is more instructive. 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In that case, the defendant was convicted of first-degree murder. The jury was instructed on first-degree murder and non-capital felony murder; however, the defendant argued that the trial court should have included a robbery instruction as well. Id. at 629, 111 S.Ct. at 2495-96.
The Supreme Court held that the defendant was not constitutionally entitled to an instruction on every lesser included noncapital offense. Id. at 627, 111 S.Ct. at 2494-95. The Court reasoned that the fact that the jury's "third option" was second-degree murder rather than robbery does not "diminish the reliability of the jury's capital murder verdict." Id. at 647, 111 S.Ct. at 2505. In this case, the fact that the jury was instructed on second-degree murder and not felony murder also does not diminish the reliability of the jury's verdict. This is especially true in light of Missouri law, Under Missouri law, the jury must find the defendant not guilty of first degree murder and then not guilty of conventional second-degree murder before it may consider second degree felony murder. Six, 805 S.W.2d at 164. In this case, the jury was instructed on first and second-degree murder, and the jury found the defendant guilty of first-degree murder. Therefore, petitioner's claim that the trial court's exclusion of the second-degree felony murder instruction was unconstitutional is not meritorious.

GROUND V. CLAY COUNTY VENIRE PANELS UNDERREPRESENT WOMEN AND YOUNG PEOPLE AND DO NOT PROVIDE A FAIR CROSS-SECTION OF THE COMMUNITY
The venire panel in this case did not come from Schuyler County but from Clay County. Petitioner claims that due to the procedures employed by Clay County, venire panels from that area underrepresent women and young people and do not provide a fair cross-section of the community. Petitioner raised this claim in his Rule 29.15 motion; however, the Rule 29.15 court denied the claim noting both that it should have been raised at trial and that petitioner had not proved his assertion regardless. (Resp't Exh. C at 295.) The Missouri Supreme Court affirmed and stated that petitioner's claim was not cognizable in a Rule 29.15 motion and that he had nonetheless failed in his proof. Six, 805 S.W.2d at 173.
Respondent argues that petitioner's claim is procedurally barred. Regardless of whether it is, petitioner's claim lacks merit. It is true that the Supreme Court has held that under the Sixth Amendment, juries must be drawn from a source fairly representative of the community. Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 701-02, 42 L.Ed.2d 690 (1975). The Sixth Amendment precludes the systematic exclusion of distinctive groups in the community from jury pools and venire panels; however, defendants are not entitled to a jury of any particular composition. Id.
In this case, petitioner's claim can be resolved based on the record and there is no need for this Court to hold a hearing because petitioner received a fair Rule 29.15 hearing in state court and was able to present evidence to support his claim at that time. Wallace v. Lockhart, 701 F.2d 719, 729-30 (8th Cir.), cert. denied 464 U.S. 934, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983). Evidence introduced at the Rule 29.15 hearing revealed that prospective jurors for a particular year are selected randomly from voter registration lists and are supplemented by personal property tax roles which often reveal people new to the county who would not yet be on the voter registration lists. (Resp't Exh. D at 333-34.) From that jury wheel venire panels are selected randomly throughout the year and the wheel is occasionally cleaned of duplicate names and of those who have been called before. Id. at 334-35. Having reviewed *1276 the testimony of petitioner's expert, this Court agrees with the findings of the Rule 29.15 court:
The proffered expert merely pointed out that Clay County's system did not perfectly generate a random selection. The only perfect system would be a random selection from a pool that contained each and every eligible juror. How this could be done he did not know. He offered no system better than what was used. The witness dealt primarily with raw figures on population, and not eligible and qualified people of various classifications.
(Resp't Exh. C at 295.) There is simply nothing in the record that even suggests that the kind of systematic exclusion of distinctive groups in the community from jury pools and venire panels prohibited by the Sixth Amendment existed in Clay County. Therefore, the Court must reject petitioner's claim.

GROUND VI. MISSOURI INSTRUCTION REQUIRING UNANIMITY ON MITIGATING CIRCUMSTANCES VIOLATES MILLS V. MARYLAND

Petitioner claims that he was illegally sentenced to death in violation of the Eighth and Fourteenth Amendments because the jury was instructed that a finding of mitigating circumstances must be unanimous. Instruction Number 19, patterned after Missouri Approved Jury Instruction (MAI) 313.44, was given at petitioner's trial:
If you unanimously find that one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstances found by you to exist, you must return a verdict fixing defendant's punishment at life imprisonment for life by the Division of Corrections without eligibility for probation or parole.
(Resp't Exh. A at 1274.) Petitioner argues that MAI-CR3d 313.44 is unconstitutional because it leads the jury to give less if any weight to mitigating evidence in their sentencing determination. Petitioner relies on Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) which stands for the rule that the jury must be permitted to consider all mitigating evidence. Mills, 486 U.S. at 384, 108 S.Ct. at 1870.
The constitutionality of the same jury instruction contested by petitioner was considered in a recent Eighth Circuit decision, Battle v. Delo, 19 F.3d 1547, 1562 (8th Cir. 1994). The Battle court distinguished the Missouri instructions from those found to be constitutionally infirm: the Missouri instructions do not require that the jury render a verdict of death as punishment if it finds the mitigating circumstances outweigh the aggravating circumstances. Id. The court also found that the "Missouri instructions did not lead the jury to the inescapable conclusion that it must unanimously agree that there were mitigating circumstances before it could fix life in prison" as the defendant's punishment. Id. Therefore, petitioner's claim is foreclosed by the Eighth Circuit's decision in Battle v. Delo. See also Parkus v. Delo, 33 F.3d 933, 941-42 (8th Cir.1994); Griffin v. Delo, 33 F.3d 895, 905 (8th Cir.1994).

GROUND VII. MISSOURI INSTRUCTION ON BURDEN OF PROOF VIOLATES CAGE V. LOUISIANA

Petitioner argues that Instruction No. 4, patterned after MAI-CR3d 302.04, is unconstitutional. The instruction was given at the guilt phase of trial used "firmly convinced" to describe the reasonable doubt standard and contained the admonition that "the law does not require proof that overcomes every possible doubt." Petitioner contends that the instruction could lead a reasonable juror to believe that a finding of guilt could rest on a degree of proof below that required by the due process clause. Petitioner likens the instruction used in petitioner's case to that found constitutionally infirm in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In Murray v. Delo, the Eighth Circuit has held that such a challenge to the Missouri reasonable doubt instruction is barred by the new-rule doctrine articulated in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Murray v. Delo, 34 F.3d 1367, 1382 (8th Cir.1994). See also Sidebottom v. Delo, 46 F.3d 744, 760 (8th Cir.1995). This Court is bound by the Eighth Circuit's holding and must reject petitioner's claim on the merits.

*1277 GROUND VIII. IMPOSITION OF THE DEATH PENALTY IS DISPROPORTIONATE TO PUNISHMENT IMPOSED IN SIMILAR CASES
Petitioner argues that his death sentence is disproportional to that imposed on other defendants in similar cases. The Eighth Amendment does not require that courts compare the sentences imposed in similar cases. Pulley v. Harris, 465 U.S. 37, 48-51, 104 S.Ct. 871, 878-79, 79 L.Ed.2d 29 (1984); Foster, 39 F.3d at 882. The Missouri Supreme Court is required to undertake a comparative review of all verdicts in which a jury or judge imposed capital punishment instead of life imprisonment. Mo.Rev.Stat. § 565.035. Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment entitles him to procedures to ensure that the right is not arbitrarily denied. Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); Foster, 39 F.3d at 882. The Supreme Court of Missouri conducted the comparative review and found that the death sentence imposed upon petitioner is not disproportionate to that imposed for similar crimes in similar cases. Six, 805 S.W.2d at 169 (State v. Kilgore, 771 S.W.2d 57 (Mo.), cert. denied, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); State v. Foster, 700 S.W.2d 440 (Mo.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986); and State v. Williams, 652 S.W.2d 102 (Mo.1983)). This Court finds that petitioner's claim presents no basis for relief.

GROUND IX. IMPROPER AND UNFOUNDED SUBMISSION OF AGGRAVATING CIRCUMSTANCES
Petitioner argues that the five aggravating circumstances submitted to the jury were not based on evidence; petitioner's claims relating to the constitutionality of the aggravating circumstances are procedurally barred. The trial court found beyond a reasonable doubt that three of the five circumstances existed:
Number One, that the murder of Kathy Allen was committed for the purpose of avoiding a lawful arrest of defendant and, second, that the murder of Kathy Allen was committed while the defendant was engaged in the perpetration of a kidnapping and, third, that Kathy Allen was a potential witness in a pending investigation of the kidnapping of Kathy Allen, and was killed as a result of her status as a potential witness.
(Resp't Exh. A at 1311-12.) The Missouri Supreme Court affirmed and concluded that the first and third circumstances, those being the ones challenged by petitioner, were supported by the evidence. Six, 805 S.W.2d at 168-69.
A federal court's review of a state court's finding of a facially constitutional aggravating circumstance should be under the `rational factfinder' standard; a federal court should ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. Lewis v. Jeffers, 497 U.S. 764, 781-83, 110 S.Ct. 3092, 3102-04, 111 L.Ed.2d 606 (1990). After reviewing the record and applying the rational factfinder standard, this Court concludes that there is sufficient evidence to support the sentencing court's finding of the three aggravating circumstances and to support the court's finding of the nonstatutory aggravating circumstance, namely the rape of Christine Allen.

GROUND X. ADMISSION DURING THE PENALTY PHASE OF INFLAMMATORY BUMPER STICKER
Petitioner argues that the trial court should not have admitted a bumper sticker on petitioner's vehicle into evidence because it lacked probative value and was inflammatory and prejudicial. Apparently, during the penalty phase of trial, the state introduced the wording of a bumper sticker on petitioner's car, which read: "I'm the person your mother warned you about." (Resp't Exh. A at 1211.) Petitioner raised this issue at trial and on direct appeal. In upholding the trial court's decision to admit the bumper sticker as evidence, the Missouri Supreme Court explained that:
The trial court has discretion to admit whatever evidence it deems helpful to the *1278 jury in assessing punishment. The jury may consider not only the nature and circumstances of the crime but also the character of the defendant. The trial judge in this case made clear the fact that he was admitting the wording of the bumper sticker under his broad discretion to admit evidence in the punishment phase. He believed the evidence relevant to defendant's character. The alleged significance of the bumper sticker did not go unchallenged. Appellant adduced testimony from his sister that the sticker was on the car when purchased. The bumper sticker was evidence of the representations appellant chose to make about himself whether he placed the sticker on the bumper or merely did not remove it after purchase. It was for the jury to determine the weight of the evidence. Appellant's argument is further weakened by the fact that the trial judge sentenced appellant and is presumed not to have been affected in sentencing by arguably prejudicial evidence.
Six, 805 S.W.2d at 166-67 (citations omitted).
The admissibility of evidence is a matter of state law; in habeas corpus proceedings, federal courts review admissibility rulings "`only when the alleged error infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process.'" Kuntzelman v. Black, 774 F.2d 291, 292 (8th Cir.1985), cert. denied 475 U.S. 1088, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986) (quoting Manning-El v. Wyrick, 738 F.2d 321, 322 (8th Cir.), cert. denied 469 U.S. 919, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984)). In order to prevail on a due process claim, petitioner must show that the asserted error was so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived him of fundamental fairness. Id.
Having reviewed the record, this Court agrees with the Missouri Supreme Court that the bumper sticker was relevant to petitioner's character; furthermore, the judge's sentence rests on a substantial factual basis, even absent the bumper sticker evidence in controversy here. As such, this Court finds that the introduction of the bumper sticker's wording did not fatally infect the penalty phase of petitioner's trial and did not violate petitioner's constitutional rights.

GROUND XI. ADMISSION OF AUTOPSY PHOTOGRAPHS OF VICTIM
Petitioner also argues that the trial court should not have admitted autopsy photographs of the victim into evidence because the pictures had no probative value and were prejudicial and inflammatory. Petitioner raised this issue in his motion for a new trial but not on direct appeal. As such, the Court finds that petitioner is procedurally barred from pursuing this claim in federal court. Gilmore v. Armontrout, 861 F.2d 1061, 1065 (8th Cir.1988), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989) (citing Benson v. State, 611 S.W.2d 538, 541 (Mo.Ct.App.1980) (Missouri procedure requires presentation of a claim "at each step of the judicial process" in order to avoid default)).

GROUND XII. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO SECURE A COMPETENCY EXAMINATION OF CHRISTINE ALLEN
Petitioner claimed in his post-conviction proceeding that his trial counsel was ineffective for failing to secure a competency examination of one of the prosecution's main witnesses, Christine Allen. The Rule 29.15 court rejected petitioner's arguments after holding a hearing and found that petitioner's trial counsel was not ineffective. (Resp't Exh. C at 292-93.) The Missouri Supreme Court affirmed. Six, 805 S.W.2d at 172.
In order to be successful on his claim of ineffective assistance of trial counsel, petitioner must show that his counsel's assistance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. at 2064. Petitioner is not entitled to an evidentiary hearing to evaluate trial counsel's performance because he received a fair Rule 29.15 hearing in state court and the dispute *1279 here can be resolved based on the record. Wallace, 701 F.2d at 729-30.
In this case, petitioner's lead trial counsel, Thomas Marshall, testified at the Rule 29.15 hearing that he did not know of any legal grounds justifying a request for a competency exam of a witness. (Resp't Exh. D at 802). He also testified that on the witness stand Christine Allen didn't appear to be incompetent. Id. at 802-803. Petitioner's other trial attorney, Gregory Robinson, also testified that Christine Allen did not seem incapacitated, that "she was fairly articulate" and that she "responded appropriately to the questions that she was asked." Id. at 659.
The Rule 29.15 court found that Missouri law at the time did not permit competency exams of witnesses with one exception: courts might allow such an exam of alleged victims of sexual crimes but only under showing of demonstrated need. (Resp't Exh. C at 293.) The court cited State v. Johnson, 714 S.W.2d 752 (Mo.Ct.App.1986), which stated the law at that time in the western appellate district of Missouri. The Johnson court stated that in Missouri all persons are prima facie competent to testify with a few statutory exceptions. Johnson, 714 S.W.2d at 758. The court explained that: "On general principle, a person who, at the time of production for examination, understands the nature of an oath and demonstrates a mental capacity sufficient to observe, recollect and narrate the things heard and seen is competent to testify." Id. The Court notes that in federal habeas corpus proceedings, this Court is bound by state court interpretation of state law. See Ricketts v. Adamson, 483 U.S. 1, 6 n. 3, 107 S.Ct. 2680, 2683, n. 3, 97 L.Ed.2d 1 (1987); McIntyre v. Caspari, 35 F.3d 338, 343 (8th Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995).
In this case, both trial counsel testified that Christine Allen appeared competent and not incapacitated on the witness stand. Having reviewed her testimony at the guilt and penalty phases of the trial, this Court cannot find any indication from Christine Allen's testimony that she was not competent to testify. Petitioner makes much of the trial court's sidebar comment that Christine Allen seemed "simple" and was "smiling somewhat inappropriately." (Resp't Exh. A at 632.) However, the judge was merely explaining to defense counsel an earlier ruling. Defense counsel had objected to the prosecution's questions regarding Christine Allen's status as a special education student. Id. at 620. The judge overruled the objection because he thought that the jurors ought to know about her education, presumably in order to weigh her testimony accordingly. Id. at 632. The judge's comment does not suggest that Christine Allen appeared incapacitated and it does not undermine the credibility of testimony of both trial counsel at the Rule 29.15 hearing.
This Court agrees with the Missouri Supreme Court that it was therefore not unreasonable for counsel not to have sought a competency evaluation of Christine Allen. Six, 805 S.W.2d at 172. Accordingly, trial counsel's failure to request such an evaluation did not rise to the level of ineffective assistance under the Strickland test, and this Court must reject petitioner's claim.

GROUND XIII. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO ADDUCE RAPE KIT AT PENALTY PHASE OF TRIAL
Petitioner claims that trial counsel was ineffective for failing to adduce the "rape kit" which allegedly would have shown the jury that there was no physical evidence to support the rape claim. Petitioner raised this claim during the Rule 29.15 proceedings. (Resp't Exh. C at 27.)
At the Rule 29.15 hearing, Marshall testified that his trial strategy was to minimize the rape and to get Christine Allen on and off the witness stand quickly. (Resp't Exh. D at 807.) While Marshall admitted that he was not aware of a "rape kit," he stated that even if he had had a rape kit showing that there was no physical evidence to support the rape allegation, he would not have introduced it; Marshall wanted to avoid a large argument in the second stage of the trial regarding whether Christine Allen was actually raped. Id. He reasoned that: *1280 [A]ttacking her [Christine Allen] credibility through cross-examination would make her even more sympathetic and ... attacking her on whether the rape occurred or not on the facts would also make her appear more sympathetic. Because we already had a situation in which Stella's [Christine's mother] throat was cut, her sister had been abducted, the whole thing in Iowa was terrible.
Id. at 809. Furthermore, attacking the rape claim might have led to testimony by Mr. or Mrs. Allen that petitioner was in a room alone with Christine for a period of time. Id. at 867. The couple might also have testified as to Christine's appearance after coming out of the room. Id. In other words, trial counsel's attack of the rape claim would have led to more witnesses and an extended discussion of the incident.
Petitioner argues that trial counsel's decision not to defend the rape claim amounts to ineffective assistance because the rape was a non-statutory aggravating circumstance that had been alleged by the state. The Court does not agree. Petitioner has not overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that under the circumstances, the challenged action might be considered sound trial strategy. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

GROUND XIV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO PREPARE ADEQUATELY FOR TRIAL
Petitioner's lead trial counsel, Marshall, entered his appearance in July of 1987. (Resp't Exh. B at 3.) Petitioner's trial in Schuyler County began July 25, 1988. (Resp't Exh. A at 280.) Petitioner argues that his counsel was ineffective because they were not prepared. Petitioner cites the three motions for continuances filed by his counsel in 1988 on June 15, July 12 and July 21. (Resp't Exh. B at 49, 146, 160.) The trial was originally set for July 11, 1988. The trial judge reset the case for July 25, 1988 and denied petitioner's successive motions. Petitioner argued on appeal that those decisions by the trial court were in error; the Missouri Supreme Court rejected petitioner's contentions. Six, 805 S.W.2d at 168. Petitioner now argues that these motions for continuances evidence a lack of preparedness on the part of petitioner's trial counsel and that as a result, their assistance was ineffective. This Court does not agree.
At the Rule 29.15 hearing, Marshall testified that he attended petitioner's trial on kidnapping charges in Iowa in September of 1987 and that he had opportunities at that time to speak with his client and the federal defense attorney. (Resp't Exh. D at 768-70.) As the Missouri Supreme Court noted, Marshall described watching the federal trial as the "best discovery" that he "could possibly get." Six, 805 S.W.2d at 168; (Resp't Exh. D at 777-78.) He admitted that by September 19, 1987, he had substantially all the discovery that the federal attorney had possessed. (Resp't Exh. D at 770.) He indicated that he had looked at all of the information by the preliminary hearing in petitioner's case on April 12, 1988. Id. at 773. Marshall received from the state all of its responses to his discovery requests at the beginning of May, 1988, and at that time, Robinson entered his appearance to assist Marshall. Id. at 773; (Resp't Exh. B at 35.) Petitioner's counsel worked with an investigator who apparently went to Iowa as part of his work and who was told to start the investigation over from scratch. (Resp't Exh. D at 859-610.)
There is no indication from Marshall's testimony at the Rule 29.15 hearing that counsel were so unprepared that they provided ineffective assistance of counsel. Marshall had a year to prepare, and he testified that he worked on the case a great deal. In addition, he had the unique opportunity of attending the federal trial and seeing a preview of much of the evidence against his client and receiving materials from the federal public defender. The record of the trial simply does not reveal any evidence that petitioner's counsel were ineffective due to a lack of preparedness under the Strickland test. Petitioner's claim therefore is not meritorious.

GROUND XV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO ELICIT CERTAIN STATEMENTS FROM WITNESSES
Petitioner also argues that trial counsel was ineffective for failing to elicit *1281 from the Allens' petitioner's statement that he and Petary would only take them out of town and let them go. Petitioner claims that this statement would have rebutted the state's position that he and Petary originally planned to kill all of the Allens. Petitioner further urges that such a statement would have contradicted the state's contention that petitioner was the actual killer of Kathy Allen.
Petitioner raised this issue in his Rule 29.15 motion and on direct appeal. The Rule 29.15 court rejected this claim and found that counsel was not ineffective. (Resp't Exh. C at 290.) The court explained that trial counsel testified that he wanted to keep out all he could of the incidents which occurred in Iowa. Id. The Rule 29.15 court's decision was affirmed by the Missouri Supreme Court:
Mrs. Allen testified that when Kathy "kept telling him that she had to go to her Special Olympics," appellant told her, "Don't worry, you'll be able to go to Special Olympics." Appellant contends, however, that counsel could have elicited far stronger evidence that homicide was not the original plan and may ultimately have been Petary's alone. He bases his contention in part upon the fact that a newspaper article quoted Mrs. Allen as saying that appellant told the family, "All we're going to do is take you out of town." Also in a federal trial of Donald Petary, there was a record of testimony to that effect. In concluding that counsel was not ineffective, the motion court noted that counsel's strategy was to limit, insofar as possible, evidence of the incidents occurring in Iowa. The court also noted that appellant's statement to the victim regarding the Special Olympics allowed counsel to argue absence of plan or deliberation. Counsel's trial strategy was not unsound, and the motion court's conclusion is not erroneous.
Six, 805 S.W.2d at 171. Having reviewed record of the trial and of the Rule 29.15 hearing, this Court finds the reasoning of the Missouri Supreme Court persuasive and thorough. Petitioner is not entitled to an evidentiary hearing before this Court; a fair Rule 29.15 hearing in state court was held, and the dispute here can be resolved based on the record. Wallace, 701 F.2d at 729-30. Having reviewed the record thoroughly, this Court concludes that petitioner has not overcome the strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance" and that, under the circumstances, the challenged action might be considered sound trial strategy. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

GROUND XVI. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO PRESENT MITIGATING EVIDENCE
Petitioner argues that trial counsel was ineffective for failing to investigate and present mitigating evidence of neurological impairment and a childhood home environment of extreme physical and cultural deprivation. Petitioner claims that had trial counsel presented such evidence the jury would have unanimously decided to sentence petitioner to life in prison. The Rule 29.15 court found that petitioner's counsel was not ineffective:
The eleventh assertion  failing to investigate and present relevant evidence at the penalty phase of trial. Counsel did investigate the case through his investigator, John Weiss. Counsel did confer with and was aware of the evidence available from all known witnesses. Movant nor anyone else suggested to counsel or the investigator the possibility of any other witnesses. Counsel had a duty to determine which evidence would be most beneficial to the Defendant during the penalty stage of trial. Counsel did this in an objectively reasonable manner and was not ineffective.
(Resp't Exh. C at 293.) The Missouri Supreme Court affirmed the Rule 29.15 court's resolution of petitioner's claim. Six, 805 S.W.2d at 172. This Court agrees that petitioner's counsel was not ineffective.
Petitioner cites the mitigating evidence presented at the Rule 29.15 hearing as that which should have been offered by trial counsel but was not. There, Tom Warner testified that petitioner had worked for him as a teenager and that he was a good, dependable worker. (Resp't Exh. D at 444-45.) In addition, *1282 a social worker's written assessment of petitioner was submitted to the Rule 29.15 court. Id. at 873. The assessment outlines petitioner's education, job history and his good relationship with his wife. (Resp't Exh. C. at 201-202, 207-208, 211.) It details petitioner's care for his retarded sister Amanda and his own struggles with attention deficit disorder, hyperactivity, moderate hearing difficulty, parental neglect, behavioral problems and drug and alcohol abuse. Id. at 197, 200-203, 211. The report names former teachers and employers who petitioner claims would have testified favorably and who had spoken highly of him.
At the penalty phase of trial, petitioner, who never testified, made his own opening remarks. (Resp't Exh. A at 1209.) He described who would be called to testify on his behalf: his mother, Carolyn Six; his sisters, Kimberly Sampson, Grace Six and Lila Thompson; his uncle, Walter Six; Petary's daughter, Jodie Petary; and Petary's step-daughter, Tonya Barnett. Id. Jodie Petary and Tonya Barnett testified first; they both stated that they had been sexually abused by Petary as youngsters. Id. at 1223-30.
Lila Thompson, petitioner's younger sister by two years, took the witness stand next; she testified that she and petitioner had a good on-going relationship. Id. at 1233. She said that he was a protective older brother when they were growing up and that neither she nor anyone she knew had trouble with petitioner when they were children. Id. at 1234. She stated that she would trust him to watch her children but that she would not trust Petary. Id. at 1237. Petitioner's other sister Kimberly Sampson followed, and she too spoke of her good relationship with petitioner, his trustworthiness, and his protectiveness. 1238-40. She added that she would not trust Petary with her child because "he molests children." Id. at 1241. Thereafter, Grace Six also attested to her ongoing close relationship with petitioner, her belief in his goodness and her dislike of Petary. Id. at 1243-45.
Petitioner's uncle, Walter Six, took the witness stand next. He said that petitioner, when he was seventeen, had lived with him for about a year; Walter Six described petitioner as a "good boy." Id. at 1247. He explained that: "[H]e done just like any other teenager, he'd come home, if he went anyplace he always told us, he went to school  finished  got his G.E.D." Id. He also said that petitioner often worked for him. Id. at 1247-48. Finally, petitioner's mother testified. Id. at 1251. She stated that petitioner was a good person who helped her when she needed him. Id. at 1253-54. She also stated that she believed that Petary molested petitioner in 1982. Id. at 1254.
During closing argument, petitioner's counsel Robinson urged the jury not to sentence petitioner to death simply because they possessed the power to do so. Robinson contended that petitioner was not born to be a killer but that something happened to him, namely his Uncle Petary. The real villain, according to Robinson, was Petary, whom he portrayed as "a degenerate, a child molester, a pervert." Id. at 1291. He claimed that Petary's abuse caused petitioner to decide to stop being abused and to start being an abuser. Id. at 1291-92. He argued that vengeance belongs to God and should not be meted out by the state. He explained that if sentenced to life in prison, petitioner would never pose a threat to society and might be rehabilitated. Id. at 1293-94.
At the Rule 29.15 hearing, Robinson, who was primarily responsible for the penalty phase of trial, explained his strategy:
[W]e eliminated the people that said negative things about Andy. We picked out the people that we thought would be best to say nice things about Andy and his background. And at that time we were also looking for people that could help make him a sympathetic person, secondarily, primarily to make him look like a person who had family, who had people who cared about him, who corresponded with him, to humanize him to a certain extent and somebody that he had worked for, his uncle that he had worked for and other people. Also we had to have  the uncle helped because it helped explain some scratches or some wounds that were on Andy that the prosecution had made something out of .... to show that Andy was a human being, that he had certain disadvantages *1283 during his life, that in spite of disadvantages he had people who cared about him and he cared about others, that it would be worthwhile for him to continue living.
(Resp't Exh. D at 664-65.) In his testimony, Robinson also touched on the need to portray Petary as a bad influence and to document through Carolyn Six petitioner's relationship with Petary. Id. at 666-67.
While Robinson did not travel to Iowa himself, he used an investigator, John Weiss. Id. at 665-66. Apparently, Marshall had worked with Weiss for many years and thought very highly of him. Id. at 858-59, 860-61. Robinson testified that he had some psychiatric reports and background evaluations on petitioner that were done in the federal case. Id. at 677. He also stated that the defense team had spoken to some former teachers and that he knew of petitioner's hearing loss and hyperactivity. Id. at 678-80. Indeed, the defense team had a mental evaluation of petitioner performed before trial which allegedly documented his history of hyperactivity, parental abuse, depression, suicidal tendencies, poly-substance and alcohol abuse and a personality disorder. (Resp't Exh. C at 233-34.)
Robinson admitted that he did not know that when petitioner drank alcohol, he would suffer from some paralysis in his left side and that petitioner's family had a history of neurological problems and seizure disorders. Id. at 688. He also testified that while he knew of petitioner's history of head injuries, he did not know of research allegedly indicating that neurological deficits or impairments may lead to unexplained explosions of violence or rage. Id. at 689-70. When asked why he chose not to pursue a presentation focusing on petitioner's possible neurological and physical problems and diminished capacity for mitigation purposes, Robinson responded that based on what he knew of petitioner, he did not think that there was enough evidence to "engender sympathy from the jury." (Resp't Exh. D at 694.) Robinson believed that the introduction of such evidence might "engender ... even more animosity." Id.
Petitioner relies on Kenley v. Armontrout and claims that Robinson's assertion that the excluded mitigating evidence urged by petitioner would not have been helpful could not serve as an excuse for failing to follow up and investigate. Kenley v. Armontrout, 937 F.2d 1298 (8th Cir.), cert. denied, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). Kenley is distinguishable from the case at hand. Counsel for the petitioner in Kenley presented no mitigating evidence during the penalty phase of trial. Kenley, 937 F.2d at 1309. The court in that case also emphasized that counsel had not performed a reasonable investigation into the existence of mitigating evidence; here, there is ample evidence that counsel, through his investigator, performed a reasonable investigation and was aware of much of the evidence now urged by petitioner. Id.
Furthermore, in Kenley, the court explained that the petitioner's past history could have been put to the jury in a sympathetic light. Id. In this case, Robinson testified that he did not believe that the evidence of petitioner's history of familial, behavioral and psychological problems was sufficient to engender sympathy. (Resp't Exh. D at 694). He also stated that he chose the witnesses he did because he was sure that their testimony would be positive; other witnesses, although willing to say nice things about the petitioner, could have been forced to disclose damaging things on cross-examination. Id. at 667.
Petitioner is not entitled to an evidentiary hearing before this Court; a fair Rule 29.15 hearing in state court was held during which petitioner presented the mitigating evidence which he now claims counsel ineffective for excluding from the trial and the dispute here can be resolved based on the record. Wallace, 701 F.2d at 729-30. The Court finds that trial counsel was not ineffective for choosing not to introduce the evidence cited by petitioner and discussed above because counsel believed such information might lead to damaging cross-examinations and might in fact antagonize the jury. See Burger v. Kemp, 483 U.S. 776, 789 n. 7, 107 S.Ct. 3114, 3123 n. 7, 97 L.Ed.2d 638 (1987). Having reviewed the record thoroughly, this Court *1284 concludes that petitioner has not overcome the strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance" and that, under the circumstances, the challenged action might be considered sound trial strategy. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

GROUNDS XVII-XXI. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: VARIOUS CLAIMS
Petitioner also argues that trial counsel was ineffective for failing: (1) to object and move for a mistrial after Christine Allen testified that Petary told her he could not stop petitioner because if he [Petary] interfered petitioner would "kill his babies"; (2) to impeach Don and Stella Allen with evidence of prior crimes; (3) to poll the jury upon the jury's return of verdict form "C" indicating it could not agree on punishment; (4) to offer certain statutory mitigating circumstances; and (5) to produce records from the Federal Bureau of Prisons which would have demonstrated that petitioner had not threatened any other inmate or guard during his incarceration. (Pet'r First Am.Pet. at ¶¶ 5-6, 8-10.) Having reviewed the record, this Court finds that these grounds are procedurally barred and that petitioner has shown neither cause for nor prejudice resulting from the default.

GROUND XXII. INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL AND 29.15 MOTION
Petitioner argues that post-conviction counsel failed to fully investigate, raise and present all issues of ineffective assistance of trial counsel. Petitioner asserts that appellate counsel for the direct appeal failed to properly present all such issues as well.
The Court must reject petitioner's claims of ineffective assistance of post-conviction counsel. There is no constitutional right to counsel in state post-conviction hearings. Foster, 39 F.3d at 877 (citations omitted). Furthermore, petitioner's claims of ineffective assistance of appellate counsel for failing to raise ineffective assistance of trial counsel claims must also fail. "In Missouri, ineffective assistance of trial counsel claims cannot be raised on direct appeal, even where the record is sufficient to permit review, and may only be raised in a Rule 29.15 proceeding." Lowe-Bey v. Groose, 28 F.3d 816, 819 (8th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 674, 130 L.Ed.2d 606 (1994) (citing State v. Wheat, 775 S.W.2d 155, 157-58 (Mo.1989), cert. denied, 493 U.S. 1030, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990)). Therefore, appellate counsel was not ineffective for failing to raise claims he was precluded from raising under Missouri law.

GROUND XXIII. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL: PROSECUTORIAL MISCONDUCT
Petitioner argues that appellate counsel was ineffective for failing to raise certain claims of prosecutorial misconduct. Petitioner contends that the prosecutor made improper and inflammatory remarks in his closing argument at the penalty phase of the trial and that he made an improper introduction to the venire panel at the commencement of voir dire. Petitioner raised these issues in his motion to recall the mandate. (Resp't Exh. I at 16-20.)
Petitioner argues that the prosecutor commented on petitioner's right to testify:
Can you think, ladies and gentlemen, of a killer and a rapist and a robber who shows less remorse for what he's done?
You've watched him during this week, ladies and gentlemen, what remorse has he shown for the death of Kathy Allen? What remorse has he shown for cutting the throat of Stella Janet Allen? What remorse has he shown for raping a seventeen year old mentally impaired girl who is six and a half months pregnant. What remorse has he shown?.... What remorse has he shown?
(Resp't Exh. A at 1301-1302.)
Indirect references to the accused's decision not to testify are impermissible if they either "(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally and necessarily take them as a comment on the defendant's failure to testify." Parkus, 33 F.3d at 940 (citing Williams *1285 v. Lockhart, 797 F.2d 344, 347 (8th Cir.1986)). A federal court reviews any improper inference to determine if it had a "`substantial and injurious effect or influence in determining the jury's verdict.'" Id. (quoting Brecht v. Abrahamson, ___ U.S. ___, ___, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)).
After reviewing the record, the Court finds that the prosecutor's comments did not violate petitioner's Fifth Amendment rights. The prosecutor cautioned the jury: "You've watched him [the petitioner] during this week." The prosecutor was asking the jury to think about petitioner's demeanor and appearance in court and to look for signs of remorse. This Court cannot say that the jury would naturally and necessarily take the prosecutor's comments as having highlighted the defendant's failure to testify. Furthermore, even if the comments were improper, this Court cannot conclude that the remarks had a substantial or injurious effect or influence on the jury's inability to reach a unanimous verdict in this case.
Petitioner also argues that the prosecutor made another objectionable and prejudicial comment:
And you've already decided, ladies and gentlemen, whether or not he's guilty of the death. Don't be misled about who actually wielded the knife blow. I think we all know probably in our hearts who did it, but you've already determined liability for that. And don't be dissuaded. Don't be dissuaded.
(Resp't Exh. A at 1302.) Petitioner contends that the prosecutor improperly implied special knowledge to the jury and that he misstated the law by telling the jury that they had already determined that petitioner was the actual killer. The jury had been instructed that they could return a verdict of guilty of first degree murder if they found that petitioner or Petary caused the death of the victim. Id. at 1120-21.
The Court disagrees with petitioner's interpretation of the prosecutor's remarks. The prosecutor did not tell the jury that they already found that petitioner was the actual killer; he simply reminded them that they had already determined liability for the crime, which is exactly what the jury did when they found petitioner guilty of murder in the first degree. Additionally, the prosecutor's comment about everyone knowing in their heart who did it did not imply special knowledge of facts outside the record. The comment was part of the prosecutor's message to the jury that they should not get hung up on the identity of the actual killer between Petary and petitioner; the prosecutor was urging that, regardless of which man wielded the knife, petitioner deserved to die. The Court finds that these comments, even if improper, were not "`so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair.'" Hamilton v. Nix, 809 F.2d 463, 470 (8th Cir.1987) (quoting Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir.1985)). Therefore, the prosecutor's comments did not violate petitioners due process rights.
Petitioner further states that the prosecutor made another improper remark during his closing argument:
Have the courage, ladies and gentlemen, the courage of your convictions to send this message, that if you invade our homes and you rape our children and rob our families and you steal our babies from our bosoms and you take them and you kill them, that if you do those things, ladies and gentlemen, it will cost you your life.
(Resp't Exh. A at 1305.) Petitioner characterizes the prosecutor's remark as an improper, personalized reference to the jurors' parental responsibilities to protect their own children and as impermissibly suggesting that the jury has a duty to return a death verdict. The trial judge and not the jury reached a verdict of death in this case and the Court cannot conclude, nor does petitioner argue, that absent the prosecutor's comments, the judge would have sentenced petitioner to life in prison. Even assuming that the prosecutor's remarks were improper, this Court cannot find that absent the improper remarks, the jury would have reached a unanimous verdict of life imprisonment. Parkus, 33 F.3d at 941.
Petitioner also claims that appellate counsel was ineffective for failing to raise on appeal the prosecutor's introduction. The *1286 prosecutor who tried petitioner's case was Joseph Landolt, an Assistant Attorney General. Landolt introduced himself to the venire panel as follows: "[M]y name is Joe Landolt. I'm an Assistant Attorney General, I work for Mr. Bill Webster, who is your elected Attorney General." (Resp't Exh. A at 314.) Petitioner argues that this introduction attached a special significance to the case which prejudiced the jurors in favor of the death penalty and prevented them from returning a unanimous verdict of life imprisonment. Petitioner's claim is meritless; if the prosecutor had refrained from telling jurors that he was with the Attorney General's office, there is simply no indication from this Court's review of the record that the jury would have then reached a verdict of life imprisonment.
In light of this Court's conclusion that petitioner's claims of prosecutorial misconduct do not provide grounds for the reversal of his conviction, petitioner's appellate counsel was not ineffective for failing to raise them.
Accordingly, this Court must reject all of petitioner's claims and deny his petitioner for a writ of habeas corpus.